[No. S116670. Feb. 10, 2005.]

In re ANDERSON HAWTHORNE, JR., on Habeas Corpus.

## COUNSEL

Maria E. Stratton, Federal Public Defender, Sean Kennedy and Harry Simon, Deputy Federal Public Defenders, for Petitioner Anderson Hawthorne, Jr.

Michael Laurence; Michael J. Hersek, State Public Defender; and Michael Millman for Habeas Corpus Resource Center, Office of the State Public Defender, and California Appellate Project as Amici Curiae on behalf of Petitioner Anderson Hawthorne, Jr.

Michele Uzeta for Protection & Advocacy, Inc., as Amicus Curiae on behalf of Petitioner Anderson Hawthorne, Jr.

John T. Philipsborn and Charles R. Weisselberg for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioner Anderson Hawthorne, Jr.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Keith H. Borjon and Robert S. Henry, Deputy Attorneys General, for Respondent State of California.

James W. Ellis, Steven K. Homer and Carol M. Suzuki for the American Association on Mental Retardation and The Arc of the United States as Amici Curiae.

## OPINION

**BROWN, J.**—Petitioner Anderson Hawthorne, Jr., is under a judgment of death. He challenges his sentence as cruel and unusual punishment based on allegations he is mentally retarded. Under the authority of *Penry v. Lynaugh* (1989) 492 U.S. 302 [106 L.Ed.2d 256, 109 S.Ct. 2934], we denied three previous petitions for writ of habeas corpus raising this same claim. Subsequently, however, the United States Supreme Court overruled *Penry* and held that execution of the mentally retarded violates the Eighth Amendment.

(*Atkins v. Virginia* (2002) 536 U.S. 304, 321 [153 L.Ed.2d 335, 122 S.Ct. 2242] (*Atkins*).) Thereafter, petitioner filed this fourth petition asserting a single claim for relief under *Atkins*.

While the matter was pending, the California Legislature enacted Penal Code section 1376 (section 1376), which sets forth the standards and procedures for determining whether a defendant against whom the prosecution seeks the death penalty is mentally retarded within the meaning of *Atkins*. (Stats. 2003, ch. 700, § 1.) By its terms, section 1376 applies only to preconviction proceedings. We issued an order to show cause to determine how to resolve postconviction claims of mental retardation. (Cf. *In re Steele* (2004) 32 Cal.4th 682 [10 Cal.Rptr.3d 536, 85 P.3d 444].) For the reasons discussed below, we conclude that such claims should be adjudicated in substantial conformance with the statutory model. Since petitioner has met the threshold showing of mental retardation, the matter will be transferred to the superior court for an evidentiary hearing on that question in accordance with the definitional standards set forth in section 1376.

## DISCUSSION

■ Although, as a constitutional principle, execution of the mentally retarded violates the Eighth Amendment, the United States Supreme Court " 'le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' [Citation.]" (*Atkins, supra*, 536 U.S. at p. 317.) The California Legislature responded by enacting section 1376, applicable in "any case in which the prosecution seeks the death penalty." (§ 1376, subd. (b)(1).) The statute defines " 'mentally retarded' " as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18." (*Id.*, subd. (a); see *Atkins*, at p. 309, fn. 3; see also *id.* at p. 309, fn. 5.) "Upon the submission of a declaration by a qualified expert stating his or her opinion that the defendant is mentally retarded, the court shall order a hearing to determine whether the defendant is mentally retarded." (§ 1376, subd. (b)(1).)[1] The defendant may request either

---

[1] Section 1376, subdivision (b)(1) provides: "In any case in which the prosecution seeks the death penalty, the defendant may, at a reasonable time prior to the commencement of trial, apply for an order directing that a mental retardation hearing be conducted. Upon the submission of a declaration by a qualified expert stating his or her opinion that the defendant is mentally retarded, the court shall order a hearing to determine whether the defendant is mentally retarded. At the request of the defendant, the court shall conduct the hearing without a jury prior to the commencement of the trial. The defendant's request for a court hearing prior to trial shall constitute a waiver of a jury hearing on the issue of mental retardation. If the defendant does not request a court hearing, the court shall order a jury hearing to determine if the defendant is mentally retarded. The jury hearing on mental retardation shall occur at the conclusion of the phase of the trial in which the jury has found the defendant guilty with a

that the court hear the claim prior to trial or that the jury decide the question following a guilty verdict and special circumstance finding. (*Ibid.*) The trial court may order the defendant examined by one or more qualified experts. (*Id.*, subd. (b)(2).)[2] The defendant must also submit to an examination by a prosecution expert. (*Centeno v. Superior Court* (2004) 117 Cal.App.4th 30, 39–41 [11 Cal.Rptr.3d 533]; cf. *People v. Carpenter* (1997) 15 Cal.4th 312, 412 [63 Cal.Rptr.2d 1, 935 P.2d 708] [tendering issue of mental condition waives Fifth and Sixth Amendment rights at penalty phase].) At the hearing, the defendant bears the burden of proof by a preponderance of the evidence, and any jury verdict must be unanimous. (§ 1376, subd. (b)(3).)[3]

The new legislation makes no provision for cases in which the death penalty has already been imposed. The task thus falls to this court to formulate appropriate procedures for resolving postconviction claims.

We are not alone in confronting this gap in the law. Following *Penry v. Lynaugh, supra,* 492 U.S. 302, the Georgia Legislature enacted the first statutory ban on execution of the mentally retarded. Like section 1376, it applies only preconviction. With respect to postconviction claims, the Georgia Supreme Court determined in *Fleming v. Zant* (1989) 259 Ga. 687 [386 S.E.2d 339], that "[w]hen a defendant who was tried before the effective date of [the operative statute] alleges in a petition for habeas corpus that he or she is mentally retarded, the habeas corpus court must first determine whether the petitioner has presented sufficient credible evidence, which must include at

---

finding that one or more of the special circumstances enumerated in Section 190.2 are true. Except as provided in paragraph (3), the same jury shall make a finding that the defendant is mentally retarded, or that the defendant is not mentally retarded."

[2] Section 1376, subdivision (b)(2) provides: "For the purposes of the procedures set forth in this section, the court or jury shall decide only the question of the defendant's mental retardation. The defendant shall present evidence in support of the claim that he or she is mentally retarded. The prosecution shall present its case regarding the issue of whether the defendant is mentally retarded. Each party may offer rebuttal evidence. The court, for good cause in furtherance of justice, may permit either party to reopen its case to present evidence in support of or opposition to the claim of retardation. Nothing in this section shall prohibit the court from making orders reasonably necessary to ensure the production of evidence sufficient to determine whether or not the defendant is mentally retarded, including, but not limited to, the appointment of, and examination of the defendant by, qualified experts. No statement made by the defendant during an examination ordered by the court shall be admissible in the trial on the defendant's guilt."

[3] Section 1376, subdivision (b)(3) provides: "At the close of evidence, the prosecution shall make its final argument, and the defendant shall conclude with his or her final argument. The burden of proof shall be on the defense to prove by a preponderance of the evidence that the defendant is mentally retarded. The jury shall return a verdict that either the defendant is mentally retarded or the defendant is not mentally retarded. The verdict of the jury shall be unanimous. In any case in which the jury has been unable to reach a unanimous verdict that the defendant is mentally retarded, and does not reach a unanimous verdict that the defendant is not mentally retarded, the court shall dismiss the jury and order a new jury impaneled to try the issue of mental retardation. The issue of guilt shall not be tried by the new jury."

least one expert diagnosis of mental retardation, to create a genuine issue regarding petitioner's retardation. The court, in its discretion, may hold a hearing on the issue, or may make the determination based on affidavits, depositions, documents, etc. If, after examining the evidence, the habeas corpus court finds that there is a genuine issue, a writ shall be granted for the limited purpose of conducting a trial on the issue of retardation only. This trial shall be held in the court in which the original trial was conducted. Petitioner shall be entitled to a full evidentiary hearing on the issue of retardation. The determination shall be made by a jury using the definition of retardation enunciated in the statute. [Citation.] The petitioner will bear the burden of proving retardation by a preponderance of the evidence. The jury shall not be bound by the opinion testimony of expert witnesses or by test results, but may weigh and consider all evidence bearing on the issue of mental retardation." (*Id.* at pp. 342–343, fn. omitted; see *Zant v. Beck* (1989) 259 Ga. 756 [386 S.E.2d 349, 351]; Ga. Code Ann. § 17-7-131.)

Oklahoma's statute likewise operates prospectively only. In *Lambert v. State* (2003) 2003 OKCR 11 [71 P.3d 30], the Oklahoma Supreme Court addressed a claim of mental retardation in a case that predated the legislation. Finding that the defendant had "raised sufficient evidence to create a question of fact on the issue of mental retardation" (*id.* at p. 31), the court remanded the question to the trial court for further proceedings with the following directions: "The hearing [—solely on the question of Lambert's mental retardation—] shall be conducted after complete discovery is afforded both parties under the Oklahoma Criminal Discovery Code. The District Court shall empanel a jury of twelve persons, granting each party nine peremptory challenges. As Lambert has the burden of proof, he shall open his case first, present evidence first, and have the opportunity to present the first and last closing arguments. Each party may have Lambert examined by an expert, and may present that expert testimony in support of the claim that Lambert is or is not mentally retarded by a preponderance of the evidence. The jury shall be instructed using a modified version of the jury instruction provided in *Murphy* [*v. State* (2002) 2002 OKCR 32 [54 P.3d 556, 567–568, 570] (defining mental retardation in terms substantially similar to § 1376)]. If the jury finds Lambert has shown he is mentally retarded by a preponderance of the evidence, it shall indicate that finding on a verdict form." (*Lambert*, at pp. 31–32, fns. omitted; see *Murphy*, at p. 569.)

Neither Ohio nor Louisiana has a statutory bar to executing the mentally retarded. The holding in *Atkins* thus left to the state supreme courts the responsibility of devising appropriate standards and procedures. (See *State v. Williams* (La. 2002) 831 So.2d 835; *State v. Lott* (2002) 97 Ohio St.3d 303 [2002 Ohio 6625, 779 N.E.2d 1011]; see also *Wiley v. State* (Miss. 2004) 890 So.2d 892.) Both courts required a threshold showing of mental retardation. (*Williams*, at p. 861 [trial court must have

" 'reasonable grounds' to believe a defendant is mentally retarded"]; *Lott*, at p. 1014 [based on IQ tests and affidavits of family and friends, defendant's mental retardation was "a disputed factual issue"].) The Louisiana court applied the statutory definition of mental retardation utilized "for the purpose of determining those individuals who qualify for mental retardation and developmental disabilities services" (*Williams*, at p. 853), which is essentially the same as California's definition, but with manifestation required by age 22 rather than 18. (*Id.* at pp. 853–854.) The Ohio court adopted the clinical definitions referenced in *Atkins*, which likewise conform to section 1376. (*Lott*, at p. 1014.) Both courts provided for an evidentiary hearing and allocated the burden of proof to the defendant by a preponderance of the evidence. However, they reserved the question of mental retardation to the trial court only. (*Williams*, at pp. 854, 859–860; *Lott*, at pp. 1015–1016.)

We conclude a similar approach—tracking section 1376 as closely as logic and practicality permit—is warranted here, both to maintain consistency with our own legislation and the judicial frameworks adopted in other jurisdictions and to avoid due process and equal protection implications.

Postconviction claims of mental retardation should be raised by petition for writ of habeas corpus, which—consistent with our current policies—may be filed initially in this court. (See Cal. Supreme Ct., Policies Regarding Cases Arising from Judgments of Death, policy 3, std. 2-1.) To state a prima facie claim for relief, the petition must contain "a declaration by a qualified expert stating his or her opinion that the [petitioner] is mentally retarded . . . ." (§ 1376, subd. (b)(1).) Not only must the declarant be a qualified expert, i.e., an individual with appropriate education, training, and experience, the declaration must explain the basis for the assessment of mental retardation in light of the statutory standard.

"Mentally retarded" means "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18." (§ 1376, subd. (a).) The Legislature derived this standard from the two clinical definitions referenced by the high court in *Atkins, supra*, 536 U.S. at page 309, footnote 3: "The American Association on Mental Retardation (AAMR) defines mental retardation as follows: '*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' [Citation.] [¶] The American Psychiatric Association's definition is similar: 'The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by

significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.' [Citation.] 'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70. [Citation.]" "It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition. [Citation.]" (*Id.* at p. 309, fn. 5.)

Accordingly, as with preconviction applications, the expert's declaration must set forth a factual basis for finding the petitioner has significantly subaverage intellectual functioning and deficiencies in adaptive behavior in the categories enumerated above. The evidence must also establish that the intellectual and behavioral deficits manifested prior to the age of 18. (See generally *People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252] [prima facie claim must "state fully and with particularity the facts on which relief is sought" and "include copies of reasonably available documentary evidence supporting the claim"].)

With respect to the intellectual prong of section 1376, respondent Attorney General urges the court to adopt an IQ of 70 as the upper limit for making a prima facie showing. We decline to do so for several reasons: First, unlike some states, the California Legislature has chosen not to include a numerical IQ score as part of the definition of "mentally retarded." Respondent cites nothing in the language or legislative history of section 1376 to support our insertion of a standard the Legislature has omitted. Moreover, statutes referencing a numerical IQ generally provide that a defendant is presumptively mentally retarded at or below that level, rather than—as respondent impliedly argues—that a defendant is presumptively not mentally retarded above it. (See, e.g., Neb. Rev. Stat. § 28-105.01; N.M. Stat. Ann. § 31-20A-2.1.) Second, a fixed cutoff is inconsistent with established clinical definitions (see *ante*, at pp. 47–48) and fails to recognize that significantly subaverage intellectual functioning may be established by means other than IQ testing. Experts also agree that an IQ score below 70 may be anomalous as to an individual's intellectual functioning and not indicative of mental impairment. (See Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) pp. 41–42.) Finally, IQ test scores are insufficiently

precise to utilize a fixed cutoff in this context.[4] (See Am. Psychiatric Assn., *supra*, at p. 41 [indicating IQ scores are considered to have a five-point measurement error]; AAMR, Mental Retardation: Definition, Classification, and Systems of Support (10th ed. 2002) p. 57; Am. Assn. on Mental Deficiency, Classification in Mental Retardation (8th ed. 1983) p. 11.)

■ Upon the submission of an appropriate declaration "by a qualified expert" (§ 1376, subd. (b)(1)), this court will—as a general rule—then issue an order to show cause returnable in the superior court in which the original trial was held, with directions to hold a hearing on the question of the petitioner's mental retardation. (See *In re Hochberg* (1970) 2 Cal.3d 870, 873–874 & fn. 2 [87 Cal.Rptr. 681, 471 P.2d 1]; *id.* at pp. 875–876 & fn. 4; see also *Griggs v. Superior Court* (1976) 16 Cal.3d 341, 347 [128 Cal.Rptr. 223, 546 P.2d 727].) In addition to maintaining parity with the statutory scheme, the order for an evidentiary hearing reflects the consensus that mental retardation is a question of fact. (See *Zant v. Beck, supra*, 386 S.E.2d at p. 351; *State v. Williams, supra*, 831 So.2d at pp. 854–855; *Richardson v. State* (Md.Ct.Spec.App. 1992) 89 Md.App. 259 [598 A.2d 1, 3]; *Murphy v. State, supra*, 54 P.3d at pp. 568, 570–571.) It is not measured according to a fixed intelligence test score or a specific adaptive behavior deficiency, but rather constitutes an assessment of the individual's overall capacity based on a consideration of all the relevant evidence. (See, e.g., *Rankin v. State* (1997) 329 Ark. 379 [948 S.W.2d 397, 402]; *Head v. Ferrell* (2001) 274 Ga. 399 [554 S.E.2d 155, 167]; *Murphy*, at p. 568; see also *Atkins, supra*, 536 U.S. at pp. 317–318; *Cartwright v. State* (2000) 242 Ga.App. 825 [531 S.E.2d 399, 403–404]; *State v. Williams*, at p. 859.)

■ With respect to the evidentiary hearing, section 1376 affords preconviction defendants the alternative of requesting a court proceeding or a jury trial. For several reasons, we deem it inappropriate to extend the jury trial option to postconviction claims. First, there is no statutory imperative to do so. Section 1376, subdivision (b)(1), provides that "the same jury [as rendered the guilty verdict and special circumstance finding] shall make a

---

[4] We also reject respondent's argument—not raised in his return but in response to the amicus curiae—that this court should "adopt a forensic test, such as was contained in *In re Ramon M.* (1978) 22 Cal.3d 419, 428 [149 Cal.Rptr. 387, 584 P.2d 524]." *Ramon M.* did not involve the construction of section 1376, but the meaning of "idiocy" when that mental condition is used as a defense pursuant to Penal Code section 26, which the defendant claimed he could assert based on his mental retardation. Adopting the American Law Institute test for mental incapacity defenses generally, this court agreed, holding "that defendant's mental retardation constitutes a defense to criminal conduct if 'at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.' [Citation.]" (*Ramon M.*, at p. 428.) We find no basis for importing this standard into section 1376, which contains nothing in its language or legislative history indicating the Legislature intended an additional subjective component as part of the definition of "mentally retarded."

finding that the defendant is mentally retarded, or that the defendant is not mentally retarded." Plainly, that is not possible postconviction. Although the Legislature could have provided for a comparable procedure, it chose to limit the enactment to preconviction claims. Moreover, because preconviction and postconviction defendants are not similarly situated, the Legislature could rationally distinguish between them for purposes of a jury trial.

Second, allowing for a jury trial would be inconsistent with established habeas corpus procedure. While a petitioner is entitled to "a full and fair hearing" on his prima facie claim, Penal Code section 1484 authorizes only "[t]he Court or Judge" to hear the proceedings.

Finally, we perceive no constitutional mandate in this regard. In *Atkins, supra,* 536 U.S. 304, the Supreme Court expressly left to the states the responsibility of " 'developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' [Citation.]" (*Id.* at p. 317.) Moreover, at least eight states cited by the court as part of the trend to bar execution of the mentally retarded provide that the question shall be determined by the court not a jury. (See Ariz. Rev. Stat. § 13-703.02, subds. (G), (H); Ky. Rev. Stat. Ann. § 532.135, subds. (1), (2); Neb. Rev. Stat. § 28-105.01, subd. (4); N.M. Stat. Ann. § 31-20A-2.1, subd. (C); N.Y. Code Crim. Proc. § 400.27, subd. 12(a); S.D. Codified Laws § 23A-27A-26.3; Tenn. Code Ann. § 39-13-203, subd. (c); Wash. Rev. Code § 10.95.030, subd. (2); *State v. Williams, supra,* 831 So.2d at pp. 859–860; *State v. Lott, supra,* 779 N.E.2d at pp. 1015–1016.)

■ Consistent with section 1376, subdivision (b)(2), the petitioner may be subject to examination by an expert appointed by the court or designated by the prosecution, or both. (See *Centeno v. Superior Court, supra,* 117 Cal.App.4th at pp. 39–41.) At the hearing, "the court . . . shall decide only the question of the [petitioner's] mental retardation." (§ 1376, subd. (b)(2).) Evidence relating to the underlying crimes shall be admissible only to the extent relevant on this question. (*Morrison v. State* (2003) 276 Ga. 829 [583 S.E.2d 873, 876]; see *Lambert v. State, supra,* 71 P.3d at p. 31.) The court "shall not be bound by the opinion testimony of expert witnesses or by test results, but may weigh and consider all evidence bearing on the issue of mental retardation." (*Fleming v. Zant, supra,* 386 S.E.2d at p. 343; *State v. Williams, supra,* 831 So.2d at p. 859.) The petitioner shall have the burden of proving his mental retardation by a preponderance of the evidence. (See § 1376, subd. (b)(3).) Review of any ultimate finding shall conform to

established appellate procedures for habeas corpus proceedings. That is, the People may challenge a finding of mental retardation by appeal to this court (Pen. Code, § 1506); the petitioner may challenge a contrary finding by further petition for writ of habeas corpus to this court.

In this case, petitioner has submitted, among other exhibits in support of his claim, the declaration of Dale G. Watson, Ph.D., a qualified clinical neuropsychologist practicing in "neuropsychological and psychodiagnostic assessment, psychotherapy, forensic psychology and in-patient hospital consultation." According to his declaration, Watson has reviewed a substantial amount of background material relating to petitioner's upbringing, educational performance, family environment, adaptive behavior, and mental condition. In addition to considering petitioner's prior intelligence test results, he "conducted a comprehensive neuropsychological evaluation" in June and August of 1995, at which time he "administered a full battery of standard neuropsychological tests, conducted a mental status examination and clinical review." As a result, Watson concluded petitioner "is one of the most profoundly impaired individuals that I have seen within a forensic population." He further opined that "based upon [petitioner's] obtained IQ scores [most of which show borderline retardation of 70–75[5]] and the history of impairment in adaptive capacities . . . , [petitioner] can be legitimately classified as being mentally retarded." That history included evidence that from early childhood petitioner was a slow learner; had trouble with basic reading, writing, and arithmetic; and had problems communicating with others.

Petitioner has also submitted a declaration of George Woods, M.D., who specializes in psychiatry and neurology. Woods interviewed petitioner but did not administer any additional intelligence tests. Based upon Woods's "experience and education, the review of voluminous documents, [his] interview with [petitioner], the data and information compiled by other experts whose declarations [he had] reviewed and [his] review of the historical, medical, psychological and educational information," he likewise concluded petitioner "is both mentally retarded and psychiatrically impaired."

■ We find this evidentiary showing sufficient to meet the statutory threshold entitling petitioner to a hearing on the question of his mental retardation. Respondent argues that, taken at face value, the various declarations attesting to petitioner's intellectual and adaptive deficiencies do not

---

[5] A report by Michael P. Maloney, Ph.D., who evaluated petitioner and administered a number of psychological tests in 1983 while petitioner was awaiting trial, reflects that "[o]n several performance (nonverbal reasoning) subtests of the Wechsler Adult Intelligence Scale, he had an estimated I.Q. of approximately 71. This would place him in the bottom 3% of the population in terms of overall intellectual ability."

establish mental retardation within the purview of *Atkins, supra,* 536 U.S. 304. Rather than negate petitioner's prima facie showing, this argument simply highlights the factual nature of the dispute between the parties—a circumstance particularly appropriate to a full evidentiary hearing on the ultimate question. (See *State v. Williams, supra,* 831 So.2d at pp. 854–855.)

### DISPOSITION

The matter is transferred to the Los Angeles County Superior Court with directions to hold a hearing on the issue of petitioner's mental retardation consistent with the views expressed in this opinion.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**CHIN, J.**—I concur with the majority opinion, which I have signed. I write separately only to stress that although Penal Code section 1376 (section 1376) states no particular intelligence quotient (IQ) below which a person must score in order to be considered mentally retarded, standardized tests like IQ tests remain important. As the majority opinion explains (maj. opn., *ante,* at p. 47), section 1376's standard is derived from *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242] (*Atkins*). The *Atkins* court said that the 70–75 IQ range "is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." (*Atkins, supra,* at p. 309, fn. 5.) Thus, a person whose IQ score is over 75 is very likely not mentally retarded, and in many, perhaps most, cases, a petitioner will not be entitled to relief absent a showing of an IQ at or below the 70–75 range.

Section 1376 defines mental retardation, in part, as including "significantly subaverage" intellectual functioning. (§ 1376, subd. (a).) The American Association on Mental Retardation (AAMR) states in its amicus curiae brief that "the term 'significantly subaverage' has been used by mental retardation professionals to describe the level of impairment found in individuals whose performance *on standardized intelligence tests* places them two standard deviations below the mean; that is, in the lowest two and a half or three percent of the population." (Italics added.) This formulation is consistent with the *Atkins* court's statement that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, the typical cutoff IQ for the intellectual function prong. (*Atkins, supra,* 536 U.S. at p. 309, fn. 5.)

Accordingly, to state a prima facie case regarding the intellectual function prong, petitioners must show that standardized intelligence tests, of which IQ tests are the most common, place them at least two standard deviations below the mean which, according to the AAMR, is roughly the lowest 2.5 to 3 percent of the population. They must also show that this intellectual deficiency manifested before the age of 18.

Kennard, J., concurred.

Petitioner's petition for a rehearing was denied March 16, 2005. Brown, J., did not participate therein.